# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| GREGORY HOLT, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | 2:04-cv-3082-JHH |
| | ) | |
| PEMCO AEROPLEX, INC., | ) | |
| | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OF DECISION

The court has before it the January 3, 2006 motion (doc. #10) of defendant Pemco Aeroplex, Inc. ("Pemco") for summary judgment.  Pursuant to the court's January 30, 2006 order, the motion was deemed submitted, without oral argument, on February 14, 2006.

## I. Procedural History

Plaintiff Gregory Holt commenced this action on October 25, 2004 by filing a complaint in this court alleging that his former employer, defendant Pemco, wrongfully denied him leave and terminated him in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq.  (See Compl.) Defendant's January 3, 2006 motion for summary judgment asserts that there are

no genuine issues of material fact and that defendant is entitled to judgment as a

matter of law.  (See generally Def.'s Mem. Supp. Summ. J.)

On January 17, 2006, defendant filed a memorandum of law (doc. #12) and

evidence[1] (docs. #13-18) in support of its motion.  Plaintiff filed a brief (doc. # 24)

and evidence[2] (doc. #23) in opposition on February 7, 2006.  Defendant filed a

---

[1] Defendant submitted the following evidence:  Excerpts from Gregory Holt's deposition; a list of Pemco Policies & Procedures signed by Holt; Warning and Suspension Notices for Holt dated March 19, 2003 and October 21, 2003; Certification of Health Care Provider Forms filled out by Holt's otolaryngologist; letters from Pemco to Holt dated April 14, 2003, August 25, 2003, and September 2, 2003 informing him that he was not eligible for FMLA leave; Pemco's policy on health-related absences; Voluntary Statements by Holt, Nick Bryce, and James Sellers about an altercation at Pemco on October 21, 2003; a letter from Pemco to Holt dated October 28, 2003 terminating his employment; excerpts from the deposition of B.J. Cotton; the union agreement between Pemco and United Automobile, Aerospace Workers of America; a memorandum from Pemco to its employees regarding absenteeism and a change in its attendance policy; Pemco's General Administrative Procedures for the Family Medical Leave Act; "return to work" slips for Holt from Dr. Trent Lowery dated March 26, 2003, April 10, 2003, and April 14, 2003; a letter from Pemco to Holt approving his request for intermittent FMLA leave dated April 14, 2003; a Certification of Health Care Provider Form filled out by Holt's family practice physician; a list of Holt's infractions during his tenure at Pemco, dated February 28, 2005; a Pemco Report of Harassment/Discrimination filled out by Holt and dated July 2, 2003; Employee Grievance Forms filled out by Holt and dated September 2, 2003; Pemco's Company Rules; notes regarding the incident on October 21, 2003; a statement signed by Darin Williams regarding the incident on October 21, 2003; and a memorandum from Don Thompson stating that Holt's discharge stands.

[2] Plaintiff submitted the following evidence:  The deposition of Gregory Holt; the deposition of B.J. Cotton; a memorandum from Pemco to its employees regarding absenteeism and a change in its attendance policy; a list of excused absences; Pemco's General Administrative Procedures for the Family Medical Leave Act; a U.S. Department of Labor handout explaining an employee's rights under FMLA; "return to work" slips for Holt from Dr. Trent Lowery dated March 26, 2003, April 10, 2003, April 14, 2003, and June 20, 2003; Certification of Health Care Provider Forms filled out by Holt's otolaryngologist and family practice physician; a letter from Pemco to Holt approving his request for intermittent FMLA leave dated April 14, 2003; letters from Pemco to Holt dated April 14, 2003, August 25, 2003, and September 2, 2003 informing him that he was not eligible for FMLA leave; a list of Holt's infractions during his tenure at Pemco, dated February 28, 2005; Defendant's Certified Response to Plaintiff's First

reply brief (doc. #25) to plaintiff's opposition on February 14, 2006.  The court has

considered all of the briefs and the evidence.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229

F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings that the moving party believes

---

Interrogatories and Request for Production; a Pemco Report of Harassment/Discrimination filled out by Holt and dated July 2, 2003; Employee Grievance Forms filled out by Holt and dated September 2, 2003; a memorandum from Don Thompson stating that Holt's discharge stands; Pemco's Company Rules; a Warning and Suspension Notice for Holt dated October 21, 2003; Voluntary Statements by Holt, Nick Bryce, and James Sellers about an altercation at Pemco on October 21, 2003; notes regarding the incident on October 21, 2003; a statement signed by Darin Williams regarding the incident on October 21, 2003; a letter from Pemco to Holt dated October 28, 2003 terminating his employment; Warning and Suspension Notices for D. Caballero, F.A. Gomez, G.A. Miller, J.D. Lewis, F.D. Galbreath, J.C. Barnes, J.M. Parrish, R. Catlin, Q.Z. Quewon, Timothy Joiner, Tommy Miller, J. Petersen, J.H. Wood, Murray Sams Jr., Donnie R. Holmes, Dale Patterson Jr., Michael Carson, James Dennis Baker, Donald Leon Rose II, and Mark Alan Orr; an Employee Grievance Form filled out by B.J. Vandegrift; a letter from Pemco to Edwin Thompson terminating his employment; a letter from Pemco to Bobby Keener terminating his employment; a written warning from Pemco to Victor Barnett; a letter from Pemco to Mr. Bussey terminating his employment; and a Standards of Conduct manual for Pemco employees.

demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Chapman, 229 F.3d at 1023.  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249-50.  The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming

4

forward with positive evidence demonstrating the absence of a genuine issue of material fact (i.e. facts that would entitle it to a directed verdict if not controverted at trial). <u>Fitzpatrick</u>, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16. If the movant

meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[3]

Plaintiff Gregory Holt began working at Pemco Aeroplex, Inc. on June 1, 1998.  (Holt Dep. at 35.)  When he began work, he completed orientation, which covered Pemco's policies and procedures on a variety of topics.  (Id. at 38-40.) Holt initially worked in the back shop, where he made aircraft parts out of raw materials, but within two years, he was transferred to "the floor" and the position of sheet metal mechanic.  (Id. at 42-44.)  Plaintiff worked in this position throughout his remaining time at Pemco, although which shift he worked varied. (Id. at 45-50.)  At the time of his termination in October 2003, plaintiff worked the

---

[3]If the facts are in dispute, they are stated in the manner most favorable to the nonmoving party.  See Fitzpatrick, 2 F.3d at 1115.

day shift as part of the mobile crew, which made relatively minor repairs to aircraft that were "coming off from outside."  (Id. at 49-50.)  Holt was a dues-paying member of the International Union, United Automobile, Aerospace Workers of America, Local No. 1155 ("the union") during his entire tenure with Pemco.  (Id. at 51.)  The collective bargaining agreement between Pemco and the union governs many of the terms and conditions of plaintiff's employment.  (Cotton Dep. Ex. 2.)

Pemco's Attendance Control Program governs employee attendance, including instances of tardiness and truancy.  (Cotton Dep. at 20-22.)  The program lists types of attendance infractions and the discipline an employee receives for each type.  (Id. at 21-23.)  The program also lists what sorts of absences qualify as "excused."  (Id. at 22-23.)  This list of excused absences was updated on February 13, 2003 in response to high absenteeism rates the previous year that were affecting the company's productivity.  (Id. at 20.)  The list went into effect on March 15, 2003, and from that point, the absences listed in the program constituted the only excused absences.  (Id. at 20-23.)  Excused absence number 14, which is relevant to the instant case, excused the following:

> Doctor appointments for **self only** for treatment of chronic/recurring illnesses, i.e., heart disease, cancer, hypertension, pregnancy, etc. This applies only to those cases where **continued medical treatment**

is necessary to maintain all normal life functions.  **(Not to be used for normal diagnostic/doctor visits.)  (Proof must be submitted within 48 hours of return to work.)**
(Cotton Dep. Ex. 3.) (emphasis in original).

After January 1, 2003, B.J. Cotton, Pemco's manager of labor relations, was ultimately responsible for determining whether an employee's absence fell within one of the excused absences on the list.  (Cotton Dep. at 23.)

The attendance control program also excuses approved medical leaves of absence.  (Cotton Dep. Ex. 3.)  Such leaves of absence are governed by Pemco's Family Medical Leave Act Policy ("FMLA policy").  (Id. Ex. 4.)  The FMLA policy provides in pertinent part:

3.4    INTERMITTENT LEAVE

3.4.1   In general, employees will not be permitted to take intermittent or reduced leave unless the Company specifically agrees otherwise.

3.4.2   Employees are permitted to take intermittent or reduced leave if "medically necessary" (for example, to take care of a sick family member or due to the employee's own serious health condition).  However, the Company reserves the right to temporarily transfer the employee to an available alternative position with equivalent pay and benefits if the employee is qualified for the position and the Company feels that the transfer will better accommodate the recurring periods of leave.

. . .

3.6    MEDICAL CERTIFICATION BY A HEALTH CARE PROVIDER

8

3.6.1   The Company will require an employee to provide medical certification from a health care provider to support any request for FMLA-leave to care for the employee's seriously ill spouse, son, daughter or parent, or due to the employee's own serious health condition.  A copy of the Certification to be filled out by the health care provider is available at the Human Resources Department.

3.6.2   When required, the employee must provide the medical certification to the Company within 15 calendar days of its initial request if the leave requested is foreseeable.  If the leave is not foreseeable, the medical certification must be provided as soon as practicable.

3.6.3   The failure to provide the requested certification within the allotted time period can result in the denial of the taking of FMLA-leave until the required certification is provided, or in the case of unforseeable leave, the FMLA-leave can be delayed or denied or can result in a denial of the continuation of the FMLA-leave.

3.6.4   If the Company has reasonable cause to doubt the validity of the medical certificate, it may require the employee to obtain a second opinion at the Company's expense.  The Company reserves the right to designate the health care provider for the second opinion.  However, that health care provider will not be an employee of the Company.

3.6.5   If the opinion of the second health care provider conflicts with the first, the Company reserves the right to require a third medical opinion, again at the Company's expense.  The health care provider selected for the third opinion will be jointly selected by the Company and the employee.  The third opinion will be final and binding.

9

  3.6.6 In cases where it is medically necessary to extend the
     employee's FMLA-leave beyond thirty (30) days, the Company
may require the employee to provide recertification regarding the serious health
condition.  The Company may require this recertification every thirty (30) days or
more often if the circumstances described by the original certification have
changed significantly or the Company receives information which casts doubt on
the certification's continuing validity.

  3.6.7 The Company will require each employee taking FMLA-leave
     due to the employee's own serious health condition to obtain
     certification from the employee's health care provider that
     he/she is able to return to work and present such certification to
     the Company's Medical Department to be cleared to return to
     work.

On August 29, 2003, a new FMLA policy went into effect, modifying Section 3.4

as follows:

  3.4.1 In general, employees will not be permitted to take intermittent
     or reduced leave **(with the exception of a medically necessary**
     **leave)** unless the Company specifically agrees otherwise.
(Cotton Dep. Ex. 5.)(emphasis in original).

Section 3.6 was unchanged in the August 2003 revisions.  (Id.)

   In 1999 or 2000, plaintiff began having sinus problems.  (Holt Dep. at 60.)

He initially sought treatment from Drs. Robert and David Bryant, and they referred

him to an ear, nose, and throat specialist, Dr. Trent Lowery, in 2003.  (Id. at 60-

61.)  In 2000, plaintiff was diagnosed with hypertension and began taking

medication for that condition.  (Id. at 60.)  During his tenure at Pemco, from 1998

until 2003, plaintiff provided doctors' excuses and missed work for various lengths

of time due to several of his own medical conditions, including a hiatal hernia operation, hypertension, degenerative disk disease, and ethmoidal sinusitis. (Id. at 51-53, 59-62.) Prior to the March 2003 change in the absenteeism policy, plaintiff never encountered a problem with anyone at Pemco when he missed work for a medical reason and submitted an excuse from a physician. (Id. at 62-64.) On March 19, 2003, however, plaintiff received a written warning for his excessive absenteeism. (Id. at 56-57, Ex. 4.) Plaintiff testified that he discussed the absences leading to this discipline with Joan Brogden, Pemco's labor relations administrative assistant at the time, and that he brought in doctors' excuses for those absences. (Id. at 57; Cotton Dep. at 24.) He was under the impression that once he had done this, those absences had been marked excused and the discipline had been cleared from his record. (Holt Dep. at 57-59.)

Plaintiff believed that the March 15, 2003 rule change required him to submit an FMLA request for any absences pertaining to doctors' visits for his chronic illnesses. (Id. at 82-83.) Plaintiff believed that his hypertension and sinusitis both fell into the category of chronic illnesses. (Id. at 83.) Accordingly, plaintiff submitted several FMLA certification forms to Pemco's labor relations department seeking to have absences related to these conditions qualify as FMLA leave. (See id. at 83-84.) On April 11, 2003, plaintiff submitted an FMLA

11

certification form filled out by Dr. Bryant requesting intermittent leave for his hypertension. (Cotton Dep. Ex. 11.) That request was approved on April 14, 2003. (Id.) According to his attendance records, plaintiff took his intermittent FMLA leave on April 9, May 6-8, May 19-20, June 5, June 20, June 23, August 22, September 5, September 9-10, September 18-19, and October 8-10 of 2003. (Cotton Dep. Ex. 12.)

On April 11, 2003, plaintiff also submitted a certification form filled out by Dr. Lowery requesting FMLA leave for his sinus condition. (See Holt Dep. at 83-84, Ex. 6.) This request was denied in a letter dated April 14, 2003 because "[t]here [was] no information received by the Company to date that indicate[d] a chronic condition." (Holt Dep. Ex. 7.) Plaintiff submitted FMLA certification forms for his sinus condition again in August and September of 2003, both of which were denied because the forms did not contain sufficient information for Pemco to determine that plaintiff had a serious health condition. (Holt Dep. at 84; Cotton Dep. Ex. 17, 19.) Because his requests for FMLA leave were denied, plaintiff's absences related to his sinus condition were counted against him on his attendance record, and he was aware this was happening. (Holt Dep. at 93.)

Plaintiff filed two grievances with the union regarding the denial of FMLA leave for his sinus condition. (Id. at 119; Cotton Dep. Ex. 20.) Those grievances

12

were unresolved at the time of plaintiff's termination.  (Holt Dep. at 120.)  Plaintiff also complained about the denial of FMLA leave to the Department of Labor.  (Id. at 122-23.)  An investigator with the department, Cheryl Arnold, conducted an investigation of plaintiff's complaint, which included conversations with B.J. Cotton and Don Thompson in Pemco's labor relations department and inspections of all records relating to plaintiff's attendance and leave.  (Cotton Dep. at 77-83.) Arnold then met with Cotton and Thompson and made some recommendations regarding Pemco's FMLA policies.  (Id. at 83.)  Although she made no official findings that Pemco had violated the FMLA in plaintiff's case, Pemco did incorporate several of her recommendations into its FMLA policy.  (Id. at 83, 182.)  Plaintiff also filed an internal harassment claim against Cotton, stating that Cotton had "discriminated against [him] with threats and coercion" by continually denying his FMLA leave requests.  (Cotton Dep., Ex. 16.)  Apparently, there was no internal investigation of this complaint.

On October 21, 2003, plaintiff clocked into work at approximately 7:00 a.m. (Holt Dep. at 127.)  He attended a safety meeting with the rest of the mobile crew working the day shift and then received his job assignment for the day.  (Id. at 127-28.)  Plaintiff was assigned to work with fellow sheet metal mechanic Nick Bryce on removing renn, a type of filler, from the tail section of an aircraft in Bay

3.  (<u>Id.</u> at 128.)  Upon arriving in Bay 3, plaintiff and Bryce realized that they

would need a tall stand to perform the work.  (<u>Id.</u> at 129.)  James Sellers, another

Pemco employee who plaintiff did not know prior to this incident, was standing

near the stand when Bryce went to retrieve it.  (<u>Id.</u> at 129-30.)  Plaintiff walked up

behind them and thought he heard Sellers say "well, you all fat MF's are not going

to do anything anyway, so you all can have it."  (<u>Id.</u> at 130.)  Upon hearing this,

plaintiff, who had a set of keys in his hand, touched Sellers on the side with the

keys and said "Man, are you talking about me?"  (<u>Id.</u> at 132.)  Sellers replied by

saying "no" and laughing.  (<u>Id.</u>)  Plaintiff then placed his keys in his pocket, and

he and Bryce continued their work.  (<u>Id.</u>)  Sellers disputes plaintiff's account of the

incident and wrote in his voluntary statement to Pemco that plaintiff walked up to

Sellers, accused him of giving plaintiff the "evil eye" the day before, stuck a knife

in his side, and told him "never to fucking be talking about him." (Cotton Dep.

Ex. 26.)  At that point, Sellers stated that he informed his supervisor and asked

him to call security.  (<u>Id.</u>)  Bryce, the only other witness to the incident, wrote in

his voluntary statement that he did not notice any confrontation between Sellers

and plaintiff and that he did not see plaintiff pull a knife on Sellers.  (Cotton Dep.

Ex. 25.)

After the incident, plaintiff went to his supervisor's desk to retrieve his roll-away toolbox.  (Holt Dep. at 133.)  When he got back to Bay 3, Pemco security confronted him and told him Sellers had accused him of pulling a knife.  (Id.)  With plaintiff's consent, the security officers patted plaintiff down and searched his pockets and his toolbox, but they did not find a weapon of any kind.  (Id. at 133-34.)  Plaintiff was then taken to the office of Darin Williams, who worked in Pemco security, where he was interviewed by Pemco management about the incident.  (Id. at 134.)  Plaintiff's union representative, Ken Scott, was also present at this meeting.  (Id. at 148.)  During this meeting, plaintiff provided a written statement detailing his account of the incident.  (Id. at 134-35.)  At the meeting, plaintiff was suspended for five days pending discharge and was given a written Warning and Suspension Notice.  (See id. at 150, Ex. 14.)  He was then escorted out of the building by security officers.  (Id. at 151-52.)

The following day, plaintiff returned to Pemco to meet with Pemco's labor relations director, Don Thompson, the labor relations manager, B.J. Cotton, the union unit chairman, Billy Vandegrift, and the union representative, Ken Scott.  (Holt Dep. at 153; Cotton Dep. Ex. 27.)  During the one-hour meeting, plaintiff once again presented his side of the story.  (Holt Dep. at 154.)  After the meeting, Cotton asked the union for additional time to continue investigating.  (Cotton Dep.

15

at 120.)  Then he asked follow-up questions of employees who had initially been
questioned and discussed various company rules with Thompson.  (Cotton Dep. at
119-20.)  After the investigation, Cotton and Thompson determined that Sellers'
version of the incident was more credible[4] and that plaintiff had violated a
company rule.  (See Cotton Dep. at 155-57, 160-61, 183-84.)  Cotton testified that
even if, as plaintiff claimed, plaintiff had used a key instead of a knife to threaten
Sellers, his actions would have been considered grounds for termination.  (Cotton
Dep. at 166-67.)  On October 28, 2003, Pemco terminated plaintiff's employment
for violating company rule 51.  (Holt Dep. at 162-63, Ex. 15.)  Thompson decided
to use rule 51,[5] the catch-all provision, instead of another rule even though other
company rules may have also been applicable to the situation.  (Cotton Dep. at
168-69.)

Plaintiff learned of his termination in a telephone conversation with
Vandegrift.  (Holt Dep. at 161.)  A few days later, after returning from a trip,
plaintiff went to the union office and filed a grievance.  (Id. at 161-62.)  According

---

[4] Cotton based his determination that Sellers was more credible on the fact that he had
previously worked with Sellers in the electrical department and on a previous incident in which
Sellers had readily admitted his guilt without expecting a reduction in punishment.  (Cotton Dep.
at 183-84.)

[5] Company rule 51 prohibits Pemco employees from engaging in "[i]ndustrial misconduct
other than that specifically covered in other rules."  (Cotton Dep. Ex. 22.)  The penalty for a first-
time violation of this rule ranges from a written warning to discharge.  (Id.)

to plaintiff, his grievance was sent to Alvin Smith, the international union's representative for the district.  (Id. at 164.)  Smith sent plaintiff a letter telling him that after two attempts to resolve the dispute, the arbitration would be withdrawn and the discharge would stand.  (Id.; Cotton Dep. Ex. 30.)  Plaintiff then contacted the union president to inquire about appealing the union's decision not to go forward with the arbitration, but the union stood by its decision not to proceed. (Holt Dep. at 164-65.)  Plaintiff subsequently commenced this action in U.S. district court.

## IV. Applicable Substantive Law and Analysis

Plaintiff's complaint alleges that (1) Pemco wrongfully denied his request for leave, interfering with his substantive rights in violation of the Family Medical Leave Act ("FMLA") and (2) he was terminated in retaliation for attempting to take medical leave pursuant to the FMLA.  Defendant's motion for summary judgment, as amplified in its memorandum in support thereof, asserts that (1) plaintiff cannot establish his FMLA interference claim as a matter of law, (2) plaintiff cannot establish a prima facie case of FMLA retaliation, and (3) even if plaintiff could establish a prima facie case, he cannot rebut Pemco's legitimate, nondiscriminatory reason for terminating him.  (See generally Def.'s Mem. Supp. Summ. J.)

17

The Eleventh Circuit has recognized two distinct causes of action under the FMLA.  Strickland v. Water Works and Sewer Bd. of Birmingham, 239 F.3d 1199, 1206 (11th Cir. 2001).  The first is an "interference" claim, "in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the [FMLA]."  Id.; see also 29 U.S.C. § 2615(a)(1).  The second is a "retaliation" claim, "in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the [FMLA]."  Strickland, 239 F.3d at 1206; see also 29 U.S.C. § 2615(a)(2).  Plaintiff initially asserted both types of FMLA claims but now concedes that he voluntarily abandoned his

interference claim during his deposition.[6]  Therefore, the court will only discuss the retaliation claim.

The FMLA makes it "unlawful for an employer to discharge or in any other manner discriminate against any individual for opposing any practice made

---

[6] The pertinent part of plaintiff's deposition reads as follows:

Q.      Your lawsuit is about, in your mind, you're contending that you were terminated in retaliation for trying to take FMLA leave and complaining about it to the Department of Labor, right?

A.      Yes.

Q.      Do you have any other complaint about what Pemco did with regard to the FMLA?

A.      No.

Q.      Are you claiming that you were harmed in any way by Pemco denying you FMLA leave?

A.      Yes.

Q.      How?

A.      They terminated me because I went to the Labor Relations Board.

Q.      What about actually denying your leave when you submitted the certification forms in April, August, and September; are you contending you sustained some kind of harm as a result of those denials?

A.      Yes.  I was in fear that I was going to lose my job.

Q.      Other than your fear of losing your job, any other harm that you allege that you suffered as a result of them denying your leave?

A.      No.

(Holt Dep. at 184-85.)  Plaintiff's counsel explicitly recognized that plaintiff waived the interference claim.  (Pl.'s Resp. Br. 1.)

unlawful by [the FMLA]."  29 U.S.C. § 2615(a)(2).  To succeed on an FMLA retaliation claim, "an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right."  Strickland v. Water Works and Sewer Bd. of Birmingham, 239 F.3d 1199, 1207 (11th Cir. 2001).  In the absence of direct evidence of the employer's intent, the Eleventh Circuit applies the burden-shifting framework the Supreme Court articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) in FMLA retaliation cases.  Id.; Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 798 (11th Cir. 2000).  Under that framework, the plaintiff must first establish a prima facie case of retaliation.  Smith v. BellSouth Telecomm., Inc., 273 F.3d 1303, 1314 (11th Cir. 2001).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action it took against the plaintiff.  Id.  If the defendant is able to articulate such a reason, the burden shifts back to the plaintiff to prove that the articulated reason is a pretext for retaliation.  Id.

### A.  Plaintiff's Prima Facie Case

To establish a prima facie case of FMLA retaliation, a plaintiff must show that (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected

conduct and the adverse employment action.  <u>Brungart</u>, 231 F.3d at 798.  It is

undisputed that plaintiff's termination constitutes an adverse employment action.

Defendant disputes, however, the first and third elements of plaintiff's prima facie

case:  whether plaintiff engaged in a statutorily protected activity and whether

there is a causal connection between the statutorily protected conduct and

plaintiff's termination.

 To show that he was engaging in statutorily protected conduct, the plaintiff

must prove that he was in fact entitled to a benefit provided by the FMLA.  <u>See</u>

<u>Russell v. N. Broward Hosp.</u>, 346 F.3d 1335, 1340 (11th Cir. 2003).  In the instant

case, the relevant FMLA provision provides that "an eligible employee[7] shall be

entitled to a total of 12 workweeks of leave during any 12-month period . . .

[b]ecause of a serious health condition that makes the employee unable to perform

the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  A

"serious health condition" is defined under the FMLA as "an illness, injury,

impairment, or physical or mental condition that involves:  (A) inpatient care in a

hospital, hospice, or residential medical facility; or (B) continuing treatment by a

---

[7] The parties do not dispute that plaintiff was an "eligible employee" within the meaning of the FMLA.  <u>See</u> 29 U.S.C. § 2611(2).

health care provider."  29 U.S.C. § 2611(11).  "Continuing treatment by a health

care provider" is defined by the FMLA regulations in pertinent part as

> (i) A period of incapacity (i.e., inability to work, attend school or
> perform other regular daily activities due to the serious health
> condition, treatment therefor, or recovery therefrom) of more than
> three consecutive calendar days, and any subsequent treatment or
> period of incapacity relating to the same condition, that also involves:
> (A) Treatment two or more times by a health care provider, by a nurse
> or physician's assistant under direct supervision of a health care
> provider, or by a provider of health care services (e.g., physical
> therapist) under orders of, or on referral by, a health care provider; or
> (B) Treatment by a health care provider on at least one occasion
> which results in a regimen of continuing treatment under the
> supervision of the health care provider.
> . . .
> (iii) Any period of incapacity or treatment for such incapacity due to a
> chronic serious health condition.  A chronic serious health condition
> is one which:  (A) Requires periodic visits for treatment by a health
> care provider, or by a nurse or physician's assistant under direct
> supervision of a health care provider; (B) Continues over an extended
> period of time (including recurring episodes of a single underlying
> condition); and (C) May cause episodic rather than a continuing
> period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)

29 CFR § 825.114(a)(2).

Further, an absence under paragraph (iii) qualifies "for FMLA leave even though

the employee . . . does not receive treatment from a health care provider during the

absence, and even if the absence does not last more than three days."  29 CFR §

825.114(e).  The regulations cite the example of an individual with asthma who

might miss work because of an asthma attack but not need to seek the help of a

health care provider on that particular occasion.  Id.

Not surprisingly, the FMLA regulations allow employers to require that an

employee's leave "be supported by a certification issued by the health care

provider of the employee."  29 CFR § 825.305(a).  The employer must give the

employee notice of this requirement, usually in writing.  Id.  The regulations also

provide that

> (c) In most cases, the employer should request that an employee
> furnish certification from a health care provider at the time the
> employee gives notice of the need for leave or within two business
> days thereafter or in the case of unforeseen leave, within two business
> days after the leave commences.  The employer may request
> certification at some later date if the employer later has reason to
> question the appropriateness of the leave or its duration.
>
> (d) At the time the employer requests certification, the employer must
> also advise an employee of the anticipated consequences of an
> employee's failure to provide adequate certification.  The employer
> shall advise an employee whenever the employer finds a certification
> incomplete, and provide the employee a reasonable opportunity to
> cure any such deficiency.

29 CFR § 825.305.

Pemco's FMLA policy, outlined above in pertinent part, clearly contained written

notice of the requirement that employees provide certification by a health care

provider, when that certification must be provided, and the consequences of failing to provide such certification.  (Cotton Dep. Ex. 4, 5.)

Defendant contends that plaintiff failed to provide adequate certification by his health care provider, even after being given a reasonable opportunity to cure the deficient certification.  This failure, defendant maintains, means plaintiff cannot show he had a "serious health condition" within the meaning of the FMLA and results in his inability to establish the first element of his prima facie case for retaliation.  The evidence supports defendant's contention.  To be sufficient, the FMLA requires that a certification by a health care provider contain the following:

> (1) the date on which the serious health condition commenced;
>
> (2) the probable duration of the condition;
>
> (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition;
>
> (4)(B) . . . a statement that the employee is unable to perform the functions of the position of the employee;
>
> (5) in the case of certification for intermittent leave, or leave on a reduced leave schedule for planned medical treatment, the dates on which such treatment is expected to be given and the duration of such treatment . . . .

29 U.S.C. § 2613(b).

Plaintiff's certification forms do not meet the requirements of 29 U.S.C. § 2613(b).  Plaintiff's initial certification form, which he submitted on April 11, 2003, specifically states that he is neither incapacitated nor unable to perform any of the

functions of his job as a result of his sinus condition.  (Holt Dep. Ex. 6.)  It merely states that he might need to miss work to see Dr. Lowery without providing even an educated guess at a possible duration for the treatment that might be provided on those visits.  (Id.)  Plaintiff's next certification, which he submitted on August 20, 2003, is even more vague than the original, containing answers of "n/a" or "unknown" on virtually every question and stating that it is only a "possibility" that plaintiff would need to miss work because of his condition.  (Holt Dep. Ex. 8.)  The "corrected" version of this second certification, which plaintiff submitted in September 2003, does not shed any more light on plaintiff's condition.  (Id. Ex. 10.)  The only real clarification it contains is the statement "Every time he gets sick will be different.  I don't know how bad it will be." in response to the question asking whether it will be necessary for plaintiff to be absent from work for treatment.  (Id.)

Without a sufficient certification by a health care provider that plaintiff suffered from a serious health condition, Pemco was within its rights, in accordance with its FMLA policy, when it denied plaintiff's request for leave. Because plaintiff failed to provide adequate certification of his serious health condition as required by Pemco's FMLA policy, he cannot establish the first

element of his prima facie case - that he was engaging in statutorily protected conduct.

Even assuming, *arguendo,* that plaintiff could establish the first element of his prima facie case, he cannot show that his termination and his attempts to take FMLA leave were causally connected.  To establish this third element of the prima facie case, "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated."  Brungart, 231 F.3d at 799.  In order to do this, a plaintiff must generally show that the employer's decision maker had notice of the protected conduct at the time of the adverse action.  Id.  The Eleventh Circuit has noted that this requirement is based on common sense:  "A decision maker cannot have been motivated to retaliate by something unknown to him."  Id. Whether an employer had notice of the protected conduct may be established by circumstantial evidence, such as the protected activity and adverse action occurring in close temporal proximity to each other.  Id.  However, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct."  Id.  Evidence of temporal proximity can be used, however, to bolster other evidence that the defendant had notice.  Strickland, 239 F.3d at 1208 n.10.

In the instant case, plaintiff can no doubt show that his termination occurred in relatively close temporal proximity to his attempts to take FMLA leave for his sinus condition and to his filing a complaint with the Department of Labor.  He complained to the Department of Labor in late summer, his last attempt to take FMLA leave for his sinus condition was in September, and he was terminated in October.  It is further uncontested that the decision makers in Pemco's labor relations department were aware of plaintiff's attempts to take FMLA leave for his sinus condition.  However, just as temporal proximity alone is insufficient to establish a causal connection when there is evidence that the decision maker did not have notice of the protected conduct, a decision maker's knowledge of the protected conduct alone is insufficient when there is evidence indicating that the decision was based on something besides statutorily protected conduct.  In this case, there is a significant amount of evidence that plaintiff's termination was based on his altercation with Sellers, not on his attempts to take FMLA leave or his complaint to the Department of Labor.  The same day the altercation occurred, plaintiff was suspended pending termination.  Following an investigation of the altercation, the labor relations department decided to terminate plaintiff.  Based on

this evidence, a reasonable jury could not find that plaintiff's termination was a result of his attempts to take FMLA leave.[8]

## B.  Defendant's Articulated Reason and Plaintiff's Rebuttal

Assuming, *arguendo*, that plaintiff could establish a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action.  <u>Wascura v. City of South Miami</u>, 257 F.3d 1238, 1242 (11th Cir. 2001).  The employer's burden at this stage is exceedingly light and is "merely one of production; it need not persuade the court that it was

---

[8] Plaintiff's deposition testimony does not indicate that he was fired for any reason other than the altercation:

Q.   And apart from going to the Department of Labor and submitting forms and doctor's notes and believing that it was a chronic condition, what other evidence do you have to support any causal link or relationship between your termination and your efforts to take FMLA leave?

A.   That's all I know.

Q.   Do you have any direct evidence; has anybody ever told you that's why you were fired?

A.   No.

Q.   Did that ever come up in the course of the investigation into the incident on October 21, 2003?

A.   No.

Q.   Did the union ever say anything to you about that?

A.   No.

(Holt Dep. at 173.)

28

actually motivated by the proferred reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (internal citations and quotations omitted).  Defendant's articulated reason for terminating plaintiff in this case is that he violated company rule 51 by placing an object, either a key or a knife, in a co-worker's side and threatening him.  Pemco has met its burden of production in this case.  A violation of a company rule is certainly a legitimate, non-discriminatory reason to fire an employee.  See, e.g., Smith, 273 F.3d at 1314 (recognizing attendance unrelated to FMLA leave as a legitimate, non-discriminatory reason); Strickland, 239 F.3d at 1208 (recognizing insubordination as a legitimate, non-discriminatory reason for termination); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (holding that firing an employee for sexual harassment is a legitimate, non-discriminatory reason).

Because defendant has articulated a legitimate, non-retaliatory reason for terminating plaintiff, the burden shifts back to plaintiff to show that the articulated reason is a pretextual.  See Wascura, 257 F.3d at 1243.  To show pretext in cases such as this one, where the plaintiff was discharged for violating a "work rule" or company policy, the plaintiff "must show either that he did not violate the work

rule or that, if he did, other employees not within the protected class who engaged in similar acts were not similarly treated." <u>Anderson v. Savage Labs., Inc.</u>, 675 F.2d 1221, 1224 (11th Cir. 1982); <u>see also</u> <u>Nix v. WLCY Radio/Rahall Comm.</u>, 734 F.2d 1181, 1186 (11th Cir. 1984).

The plaintiff has not meet this burden in the instant case.  He cannot show that he did not violate the work rule.  On the contrary, he admitted to placing a key in Sellers' side and confronting him.  Pemco's management felt this behavior violated one of its company rules and warranted termination regardless of whether the object used was actually a key or a knife.  It is not within this court's discretion to determine the propriety of Pemco's decision to terminate plaintiff.  As the Eleventh Circuit has long recognized, federal courts "do not 'sit as a super-personnel department that reexamines an entity's business decisions.'" <u>Cooper v. Southern Co.</u>, 390 F.3d 695, 738 (11th Cir. 2004) (quoting <u>Elrod</u>, 939 F.2d at 1470).  Plaintiff has also failed to identify similarly situated comparators who were treated differently and therefore cannot establish the other half of the "work rule" test:  that other employees who violated the same rule were not treated similarly.

For each of the foregoing reasons, separately, the court finds that no material issues of fact remain and that defendant Pemco is entitled to judgment as

a matter of law as to all claims asserted by plaintiff.  A separate order will be entered.

**DONE** this the __8th__ day of March, 2006.

_____

SENIOR UNITED STATES DISTRICT JUDGE